**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

CIVIL ACTION NO. 07-571-C

JAMES F. BAYS,                                                    PLAINTIFF,

V.                    <u>MEMORANDUM OPINION AND ORDER</u>

SUMMITT TRUCKING, LLC, ET AL.,                            DEFENDANTS.

* * * * * * * * * *

This matter is before the court upon the motion for summary judgment by

defendant Summitt Trucking, LLC (R. 49); the motion for declaratory judgment by

intervenor Great American Assurance Co. (R. 73); and the motion for summary

judgment by defendant Donald Dekalands (R. 64). The court will deny Summitt's

motion, grant Great American's motion, and deny Dekalands's motion.

**I. Background**

Dekalands hauled loads for Summitt Trucking, LLC ("Summitt").  He operated

a Freightliner semi-tractor that his wife owned and which was leased to Summitt.

On September 29, 2007, Dekalands drove the semi-tractor, hitched to a trailer

holding a load of freight, to the Summitt freight yard.  After dropping off the trailer

and its load, he began to drive home in the tractor.  En route, he entered the lane of

oncoming traffic and struck the vehicle driven by the plaintiff, James Bays.  Bays

brought this suit seeking damages for his injuries.

Dekalands and Summitt had entered into an Independent Contractor

Agreement.  R. 49, Ex. 1.  Under the terms of the agreement, Dekalands was the

owner-operator, or "CONTRACTOR," of the semi-tractor and Summitt was the "CARRIER." *Id.* at 1. The Agreement provided that it was Summitt's responsibility to obtain liability insurance for the vehicle "at all times while [it] is being operated on behalf of [Summitt]." *Id.* at App. B, ¶1. Summitt obtained such an insurance policy from Liberty Mutual Insurance Company.

The Agreement also required Dekalands to obtain liability insurance that would provide coverage "whenever the [semi-tractor] is not being operated on behalf of [Summitt]." *Id*. at ¶ 2. Dekalands's wife obtained a "Non-Trucking Liability Policy" with Great American Assurance Co. ("GAAC") on June 29, 2007. The policy contained an exclusion for any liability "arising out of any accident which occurs while the covered auto is being used in the business of anyone to whom the covered auto is leased, rented, or loaned or while the covered auto is being used to transport cargo of any type." R. 66, Ex. 1, Part 2, ¶ C13.

At the time of the accident, the tractor driven by Dekalands displayed Summitt's ICC Certificate and a "Summitt" decal on the driver's door. The Independent Contractor Agreement and the two insurance policies were also in effect.

Bays filed suit against Summitt Trucking (R. 1), and later added Donald Dekalands (R. 19). BlueCross BlueShield of Alabama (BCBS), the administrator of Bays's employee group health benefit plan, intervened (R. 30) and Summitt responded with a motion for summary judgment (R. 49). After that, GAAC

2

intervened (R. 66) and Dekalands added a third-party defendant, "John Doe," the unidentified driver of a van that Dekalands claims was negligently stopped in his lane that he was allegedly attempting to avoid when he swerved into oncoming traffic and collided with Bays (R. 62). Dekalands filed a motion for summary judgment (R. 64), and GAAC filed a motion for declaratory judgment (R. 73).

Due to Summitt Trucking's notice of bankruptcy, this court issued an order on May 20, 2009 (R. 91), denying without prejudice the three pending motions in this matter and staying proceedings (R. 79). Pursuant to the notice and modification and lifting of bankruptcy automatic stay, filed on September 17, 2009 (R. 94), and telephonic status conference on December 8, 2009 (R. 99), the court will consider each of the three motions in turn.

## II. Summitt Trucking's Motion for Summary Judgment

Summary judgment is appropriate only when there are no genuine issues of material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The court must view all of the evidence in the light most favorable to the party opposing summary judgment. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Because Interstate Commerce Commission ("ICC")[1] regulation 49 C.F.R. §

--------

[1]The ICC was abolished in 1995, and today, the Federal Motor Carrier Safety Administration (FMCSA), formerly a part of the Federal Highway Administration, within the United States Department of Transportation, maintains the regulations and promulgates new ones. *See* http://www.fmcsa.dot.gov/about/aboutus.htm. Because most case law still refers to "ICC regulations," this court will do the same.

376.12 establishes a rebuttable presumption that Dekalands was acting within the scope of his employment while driving the leased semi-tractor at the time of the accident, and because Summitt has not overcome that presumption by proof that Dekalands was acting outside the scope of his employment when the accident occurred, the court will deny Summitt's motion.

A. Federal Law: Rebuttable Presumption that Dekalands Acted Within the Scope of Employment

The lease establishing the agreement between Dekalands and Summitt Trucking is governed by an ICC regulation that states:

> Except as provided in the exemptions set forth in Subpart C of this part, the written lease required under § 376.11(a) shall contain the following provisions. The required lease provisions shall be adhered to and performed by the authorized carrier.
>  . . .
> (c) Exclusive possession and responsibilities
>     (1)    The lease shall provide that the authorized carrier lessee shall have exclusive possession, control, and use of the equipment for the duration of the lease. The lease shall further provide that the authorized carrier lessee shall assume complete responsibility for the operation of the equipment for the duration of the lease.
>     [. . .]
>     (4)    Nothing in the provisions required by paragraph (c)(1) of this section is intended to affect whether the lessor or driver provided by the lessor is an independent contractor or an employee of the authorized carrier lessee. An independent contractor relationship may exist when a carrier lessee complies with 49 U.S.C. § 14102 and attendant administrative requirements.

49 C.F.R. § 376.12.

i.    Sixth Circuit Jurisprudence

The resolution of liability in this case turns on the interpretation of section

(c)(1) of the regulation, which gives the carrier-lessee "complete responsibility for

the operation of the equipment for the duration of the lease."  The liability of the

carrier-lessee is determined under the doctrine of respondeat superior, and 49

C.F.R. § 376.12 creates a rebuttable presumption that Dekalands was acting within

the scope of his employment as he bobtailed[2] home after completing a trip for

Summitt.  *Wilcox v. Transamerican Freight Lines, Inc.*, 371 F.2d 403 (6th Cir.

1967).

This court is not persuaded by Bays's argument that the Sixth Circuit

rejected the *Wilcox* rule and embraced strict liability in *Johnson v. S.O.S.*

*Transport, Inc.,* 926 F.2d 516 (6th Cir. 1991), by commenting, in dicta, that 49

C.F.R. § 376.12 "[u]ndoubtedly . . . render[s] lessee carriers vicariously liable,

notwithstanding traditional principles of agency, for injuries sustained by third

parties resulting from the negligence of the drivers of the leased vehicles." *Id.* at

521.  To the contrary, the Sixth Circuit's statement in *Johnson* that "Congress

intended that carriers who use leased equipment would be subjected to the same

requirements . . . to which they would be subjected in using equipment owned by

them" reaffirmed part of the *Wilcox* holding that is pertinent for the resolution of

this case.  *Id.* at 523.  That is, a carrier-lessee should not have greater liability, and

_____
[2]"Bobtailing" is trucking parlance for driving a tractor truck without a trailer
attached. *Prestige Cas. Co. v. Mich. Mut. Ins. Co.*, 99 F.3d 1340, 1343 (6 th Cir.
1996) (citation omitted).

certainly should not be strictly liable, for a negligent act of an owner-driver where such carrier would not be liable for a similar act of negligence by its own employees or when using its own equipment. *See Parker v. Erixon*, 473 S.E.2d 421, 426 (N.C. Ct. App. August 6, 1996).

Moreover, *Johnson* was decided prior to the 1992 amendments to the ICC regulations, discussed more fully *infra*, and the *Johnson* court distinguished the issue before it – carrier liability under the ICC regulations for injuries sustained by the driver of the leased vehicle – from the issue before this court – carrier liability under the ICC regulations for third parties. *Id.* at 522. The instant case and *Johnson* are further factually distinguishable. The driver in *Johnson* was unquestionably within the scope of his employment, hauling a load for the carrier-lessee, when he was in a fatal accident, while Dekalands was bobtailing and arguably outside the scope of his employment when he collided with Bays. *Id.* at 518. The *Johnson* court did not address whether the driver was acting on behalf of the lessee-carrier at the time of the alleged negligence, perhaps because it was so obvious. Thus, *Johnson* cannot be read to dispose of the necessity of analyzing the scope of employment in all carrier liability cases. In fact, *Johnson* included a footnote comparing its sweeping statement of strict vicarious liability to *Wilcox's* holding that a carrier-lessee was not liable for the negligence of an owner-driver who had completed his assignment at the time of the collision and was outside the scope of his employment. *Id.* at 522 n.13.

6

*Gilstorff v. Top Line Express, Inc.*, No. 96-3081, 1997 WL 14378 (6th Cir. Jan. 14, 1997), also does not impose strict vicarious liability on Summitt. The *Gilstorff* court observed that "most courts have concluded as a matter of federal law that the ICC regulations impose an irrebuttable statutory employment relationship between the driver and carrier-lessee," but noted that "[t]he Sixth Circuit has not yet done so however." 1997 WL 14378, at *2 n.6. It then cited several cases criticizing *Wilcox* and noted that one, *Wyckoff Trucking, Inc. v. Marsh Bros. Trucking Serv., Inc.*, 569 N.E.2d 1049 (Ohio 1991), which held that the ICC regulations create an irrebutable presumption of an employment relationship, "is an accurate statement of federal law." *Gilstorff*, 1997 WL 14378, at *2 n.6. This court cannot take such an oblique discussion in a footnote as a statement of Sixth Circuit law. Further, all the cases cited in *Gilstorf*, including *Wyckoff*, predated the 1992 ICC amendments, discussed *infra*.

Nor is this court persuaded to reject *Wilcox* by two recent district court opinions which rely upon the flawed logic of *Johnson* and *Gilstorff*. *See Darling v. J.B. Expedited Servs., Inc.*, No. 2:05-CV-00017, 2006 WL 2238913, at *26-27 (M.D. Tenn. Aug. 3, 2006) (analyzing a motor-carrier's liability under state agency law after noting that the ICC regulations create an irrebuttable presumption of an employment relationship between the carrier and driver), *and Holliday v. Epperson*, No. 1:02-CV-1030-T, 2003 WL 2340746, at *3 (W.D. Tenn. Aug. 26, 2003)

(noting that 49 C.F.R. § 376.12 "imposes an irrebuttable statutory employment relationship between the driver and the carrier-lessee").

*Wilcox* continues to be the law of the Sixth Circuit, notwithstanding Bays's arguments to the contrary.

ii.    1992 ICC Amendments: Agency Principles Reaffirmed

Decisions of the ICC support this court's adoption of the principles of agency law.

The majority of federal circuit courts that Bays cites for the proposition that lessee-carriers are strictly liable for owner-operators' negligence while operating leased vehicles did so prior to the 1992 amendments to the regulations. *Price v. Westmoreland*, 727 F.2d 494, 495 (5th Cir. 1984); *Rodriguez v. Ager*, 705 F.2d 1229, 1237 (10th Cir. 1983); *Wellman v. Liberty Mut. Ins. Co.*, 496 F.2d 131, 136 (8th Cir. 1974); *Mellon Nat'l Bank & Trust Co. v. Sophie Lines, Inc.*, 289 F.2d 473, 478 (3d Cir. 1961). Those cases were "based upon an interpretation of the ICC regulations that were unintended by the ICC." *Penn v. Va. Int'l Terminals, Inc.*, 819 F. Supp. 514, 523 (E.D. Va. 1993). Specifically, in 1992, section (c)(4) was added, which is directly applicable to the issue before this court. It renders older cases "a misrepresentation of the regulation, especially with the hindsight provided by the 1992 amendment . . . ." *Id.* at 522-23.

Notably, the ICC expressed support for this court's interpretation of the neutral effect of section (c)(1) on carrier liability. Administrative agencies, like the

ICC, are entitled to deference when interpreting their own regulations. *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945). Commentaries issued by the ICC prior to the 1992 amendments demonstrate the ICC's intention that courts apply traditional law of agency in resolving questions of liability such as the present one. "The Commission did not intend that its leasing regulations would supersede otherwise applicable principles of State tort, contract, and agency law and create carrier liability where none would otherwise exist." *Ex Parte No. MC-43 (SUB-NO 16),* Lease and Interchange of Vehicles (Identification Devices), 3 I.C.C. 2d 92, 93 (1986).

Then, in 1992, when the ICC added section (c)(4) to the regulation, the ICC reaffirmed that it did not intend section (c)(1) to have sweeping effects on the obligations of the carrier-lessee. In fact, the ICC asserted the neutrality of the regulation on the independence of lessors and stated "that the regulation does not affect 'employment' status." *Pet. to Amend Lease and Interchange of Vehicle Regulations*, 8 I.C.C. 2d 669, 671 (1992). The addition of section (c)(4) was meant to "give notice to the courts . . . that [(c)(1)] . . . is not intended to affect the relationship between a motor carrier lessee and the independent owner-operator lessor." *Id.* at 670.

      iii.    Legislative History and Public Policy: A Rebuttable Presumption is Prudent

This court's interpretation is also in line with Congress's purpose in amending the Interstate Common Carrier Act in 1956 "[i]n order to protect the

public from the tortious conduct of the often judgment-proof truck-lessor operators

. . . [by] . . . requir[ing] interstate motor carriers to assume full direction and control

of the vehicles 'as if they were the owners of such vehicles.'" *Morris v. JTM*

*Materials, Inc.*, 78 S.W.3d 28, 37-38 (Tex. App. 2002) (quoting *Price v.*

*Westmoreland*, 727 F.2d 494, 495-96 (5th Cir. 1984)).  This court's construction

of 49 C.F.R. § 376.12 gives effect to that congressional intent of thwarting abuses

by carriers who would lease equipment from independent contractors who were not

so regulated by presuming an agency relationship between the common carrier and

lessor. *Prestige Cas. Co. v. Mich. Mut. Ins. Co*, 99 F.3d 1340, 1342-43 (6th Cir.

1996); *Johnson*, 926 F.2d at 523, n.17.  However, holding carriers strictly liable

does more than level the playing field when it comes to a carrier's vicarious liability

for contract and employee drivers; it over-corrects the problem Congress sought to

address.

        The logic that Bays advances can lead to absurd results, like in *Morris v. JTM*

*Materials, Inc.*, and was exactly what the *Parker v. Erixon* court avoided.  In both

cases, carrier-lessees were sued when drivers on their own time caused serious

injury (and even death) to third parties.  *Morris*, 78 S.W.3d at 35; *Parker*, 473

S.E.2d at 422-23.  The *Morris* court held a motor carrier strictly vicariously liable

for the negligence of a drunk driver hired by the lessee who hit a motorist, even

though it concluded that the driver was not acting in the course and scope of his

employment at the time of the accident.  78 S.W.3d at 34-35.  *Morris* was based

10

entirely on pre-1992 case law that section (c)(1) made a carrier-lessee liable "even if the driver embarks on an undertaking of his or her own while using the carrier-lessee's I.C.C. authority." *Wyckoff*, 569 N.E.2d at 1053. In contrast, the *Parker* court, relying heavily on ICC decisions for support, held that the ICC regulations created a rebuttable presumption of agency, and absolved the carrier of liability for a driver's negligence under North Carolina respondeat superior principles. 473 S.E.2d at 424-27.

Here, undisputed facts establish that Dekalands was driving home from the Summitt freight yard when the accident occurred. The parties' lease complied with ICC regulations and established that the semi-tractor was under Summitt's exclusive control and possession. Pursuant to section (c)(1), there is a rebuttable presumption that Dekalands was acting within the scope of his employment because he was driving the leased vehicle.

B.    State Agency Law: Presumption Not Rebutted

Since 49 C.F.R. § 376.12 creates a rebuttable presumption of agency, the court must analyze the respective liabilities of Summitt and Dekalands according to Kentucky law. *See Wilcox*, 371 F.2d at 404. No Kentucky decision has directly addressed the issue before this court, but under Kentucky agency law, Summitt is vicariously liable for Dekalands's negligence if he was "acting within the scope of his employment and in the furtherance of [Summitt's] business." *See Mid-States Plastics, Inc. v. Estate of Bryant ex rel. Bryant*, 245 S.W.3d 728, 730 (Ky. 2008)

11

(citing *Wiggington Studio v. Reuter's Adm'r*, 71 S.W.2d 14, 16 (Ky. Ct. App. 1934)).

To be within the scope of employment, an employee's conduct must be "of the same general nature as that authorized or incidental to the conduct authorized." *Osborne v. Payne*, 31 S.W.3d 911, 915 (Ky. 2000) (citing *Wood v. Se. Greyhound Lines,* 194 S.W.2d 81, 83 (Ky. Ct. App. 1946)). At the time of the accident, Dekalands was returning to his home after dropping off a loaded semi-trailer at Summitt's yard and he was not scheduled to haul any loads for Summitt for the next few days. Under general agency principles, outside the trucking industry, an employee like Dekalands commuting home from work is considered to be acting outside the scope of his employment. *Bisel v. United States*, No. 96-1500, 1997 WL 415316, at *2 (6th Cir. July 22, 1997). However, "it is the nature of the trucking business that drivers will make deliveries and return home with no further load or assignment. These drivers are still, however, using the trucks in the business of the company." *Greenwell v. Boatwright*, 184 F.3d 490, 491-92 (6th Cir. 1999) (adopting the reasoning of *St. Paul Fire Ins. Co. v. Frankart*, 370 N.E.2d 1058, 1062 (Ill. 1977)); *see also Republic W. Ins. Co. v. Williams*, 212 Fed. App'x 235 (4th Cir. 2007) (holding a carrier-lessee liable for damages of an owner-operator driver who was in an accident while driving his vehicle from his home to the freight yard where he was intending to pick up a load).

Summitt does not argue that Dekalands bobtailed home without permission or that he should have left his semi-tractor at Summitt's yard; it seems understood between the parties that Dekalands usually parked the semi-tractor at his home. Construing the evidence in the light most favorable to Bays, the non-moving party, Dekalands's home was the termination point of the journey he made on Summitt's behalf and he was still furthering Summitt's trucking business until he reached there. *See Grimes v. Nationwide Mut. Ins. Co.*, 705 S.W.2d 926, 931 (Ky. Ct. App. 1985) (noting that if the driver had been making a trip for the carrier company, "it might be reasonable to conclude that [he] was using his truck in the business [of the carrier] on his return" trip, even if the driver was bobtailing).

In conclusion, Summitt has not demonstrated that it is entitled to judgment as a matter of law that Dekalands was acting outside the scope of his employment when the accident occurred. Thus Summitt's motion will be denied.

**III.    Defendant Donald Dekalands's Motion for Summary Judgment**

Dekalands is not entitled to summary judgment against third-party defendant John Doe because there are genuine issues of material fact as to Doe's negligence and Dekalands's own exercise of due care. Moreover, the court points Dekalands to Federal Rule of Civil Procedure 4(m), "Time Limit For Service":

> If a defendant is not served within 120 days after the complaint is filed, the court — on motion or on its own after notice to the plaintiff — must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an

appropriate period.  This subdivision (m) does not apply to service in a foreign country under Rule 4(f) or 4(j)(1).

Dekalands, the third-party plaintiff, has not served the John Doe defendant despite the passage of more than 120 days from the filing of the complaint.  The claims against said Doe defendant shall be dismissed pursuant to the terms of Fed. R. Civ. P. 4(m) if Dekalands does not show good cause for his failure within ten days from the entry of this order.

Dekalands argues that Doe was negligent for "fail[ing] to operate his vehicle in a safe manner upon a Kentucky roadway," and that such negligence was the proximate cause of the collision between Dekalands and Bays.  R. 64, at 5.  He further alleges that Doe was negligent per se for violating four Kentucky statutes: KRS § 189.380 for failing to give a proper turn signal; KRS § 189.055 for having inoperable brake lights; KRS § 189.290 for failing to operate his vehicle safely; and KRS § 189.580 for leaving the scene of the accident.  Dekalands asserts that those violations were the proximate cause of his collision and, thus, summary judgment is warranted.

A violation of a statute does not necessarily create liability.  *Lewis v. B & R Corp.,* 56 S.W.3d 432, 438 (Ky. Ct. App. 2001).  Indeed, "in order for a statutory violation to become negligence per se, the plaintiff must be a member of the class of persons intended to be protected by the regulation, and the injury suffered must be an event which the regulation was designed to prevent."  *Carman v. Dunaway Timber Co., Inc*., 949 S.W.2d 569, 570 (Ky. 1997).  Additionally, the statutory

14

violation must be a substantial factor in causing the injury. *Britton v. Wooten*, 817 S.W.2d 443, 447 (Ky. 1991). Kentucky has codified negligence per se in KRS § 446.070. *See Davidson v. Amer. Freightways Inc.*, 25 S.W.3d 94, 99 (Ky. 2000). Dekalands's summary judgment argument fails, however, because he has not put forth sufficient evidence to support a finding that Doe violated those statutes and because he has failed to prove that the alleged violations were a substantial cause of Bays's injuries. Resolving all inferences and ambiguities in favor of Doe, the facts do not establish that Doe was negligent or that his alleged statutory violations constitute negligence as a matter of law.

There are genuine issues of material fact as to Doe's negligence. Dekalands testified in his deposition that he was driving the semi-tractor home when he observed a van stopped in his lane of traffic, immediately in front of him. He stated the van did not have its brake lights or turn signal activated. According to Dekalands, to avoid hitting the van, he applied his brakes and, as a result, skidded into oncoming traffic. *See* Dekalands Dep. 45:18-46:16. However, Bays's and a witness's accounts of the accident conflict with Dekalands's deposition testimony. And although Dekalands claims that "un-rebutted testimony" proves Doe's statutory violations (R. 64, Mem. at 5), Doe has not yet been identified.

First, Dekalands has not established that Doe's failure to use a turn signal amounted to a violation of KRS § 189.380 or was a substantial factor in causing Bays's injuries. In fact, it is not clear that Doe actually intended to turn when

15

Dekalands spotted him in his lane, so it is not clear whether Doe's turn signal should have been engaged.  That Doe's van allegedly turned left into Bud's Gun and Knife Shop *after* the accident does not prove that he intended to turn there *before* the accident, which would have necessitated the use of his turn signal.

Second, there is a genuine dispute as to whether Doe's brake lights were or should have been lit.  Most troubling for summary judgment purposes is Dekalands's own confusion regarding the van's state immediately before his accident with Bays.  At one point in his deposition, Dekalands agreed with the police report that a van was stopped in his lane in front of him.  Dekalands Dep., 45:24-46:11.  But at another point, Dekalands admitted that when he approached the van, he mistakenly thought it was simply moving along at a slower speed. Dekalands Dep., 46:24-35.  A witness reported the van was stopped (Dekalands Dep., 46:2-3), but Bays testified in his deposition that he recalled the van was still moving at the time of his impact with Dekalands (Bays Dep., 30:19-25, Nov. 12, 2008).

It is not possible that Bays, who was approaching the van from the opposite direction, could have observed the presence or absence of the van's brake lights. And, obviously, if the vehicle was still moving, its brake lights would not have engaged.  These factual inconsistencies preclude granting summary judgment regarding Doe's alleged violation of KRS § 189.055.

Third, Dekalands has not conclusively demonstrated that Doe violated KRS §

189.290, which codifies a driver's general duty of care, or that the violation

resulted in the collision.  Viewing the facts in a light most favorable to Doe and

drawing all reasonable inferences from the evidence in Doe's favor, it cannot be

said that Doe violated that duty of care as a matter of law.  *Morgan v. Morgan*, No.

2005-CA-001739-MR, 2006 WL 3040019, at *2 (Ky. Ct. App. Oct. 27, 2006).

Even when a motorist rear-ends another vehicle, Kentucky courts are hesitant to

find the driver negligent as a matter of law, so whether Doe violated a general duty

of care in this case should be a question resolved by the finder of fact.  *See, e.g.*,

*USAA Cas. Ins. Co. v. Kramer*, 987 S.W.2d 779, 782 (Ky. 1999) (holding that a

driver must be proven to have violated duty of ordinary care to a jury before he can

be found at fault); *see also Lucas v. Davis*, 409 S.W.2d 297, 300 (Ky. 1966)

(refusing to find as a matter of law that a driver was negligent in violating KRS §

189.290(1), among other provisions, for striking the automobile in front of it);

*Danville Cab Co. v. Hendren*, 201 S.W.2d 561, 563 (Ky. 1947).

Fourth, and finally, Doe's leaving the scene of the accident did not contribute

to the accident itself, so Doe cannot be negligent per se as to the supposed

violation of KRS § 189.580(1)(a).  The facts as alleged do not support Dekalands's

contention; because the van was not involved in the accident, Doe was free to

leave.  KRS § 189.580(1)(a) (requiring action by "[t]he operator of any vehicle,

whose vehicle, vehicle load, or vehicle equipment which is involved in an

17

accident"). Even if Doe was found to have violated KRS § 189.580 by leaving the scene of an accident, it cannot be said that the accident resulted from that violation. Nor is a collision the type of harm that the statute requiring a motorist to stop and render assistance after a collision was designed to prevent. Because Dekalands cannot establish all the elements of this cause of action, his summary judgment motion fails as to Doe's alleged violation of KRS § 189.580.

Even if this court assumes that Doe was negligent and committed all of the statutory violations enumerated above, a jury could find that Dekalands breached his duty to exercise ordinary care for Bays's safety, rendering summary judgment for Dekalands inappropriate. Specifically, it is a driver's duty to keep a proper lookout, operate a car in reasonable control and with reasonable speed, and with ordinary care to avoid collision with other vehicles, having due regard for the safety of other vehicles using the streets. KRS § 189.290. *See Cox v. Cooper*, 510 S.W.2d 530, 534 (Ky. 1974). At the very least, whether Dekalands breached his duty of care in driving and whether that alleged breach contributed to the collision between him and Bays is a jury issue. Accordingly, the court will deny Dekalands's motion for summary judgment against third-party defendant Doe. Additionally, this court will dismiss the claims against Doe absent a showing of good cause by Dekalands within ten days of the date of entry of this order.

**IV.    Intervening Plaintiff GAAC's Motion for Declaratory Judgment**

According to the Declaratory Judgment Act, 28 U.S.C. § 2201(a), "any

court of the United States, upon the filing of an appropriate pleading, may declare

the rights and other legal relations of any interested party seeking such declaration,

whether or not further relief is or could be sought."  Whether a district court

exercises jurisdiction under this statute, however, is within its discretion.  *Wilton v.*

*Seven Falls Co.*, 515 U.S. 277, 288 (1995) (stating that the Declaratory Judgment

Act "created an opportunity, rather than a duty, to grant a new form of relief to

qualifying litigants").  The court considers five factors to determine whether it

should exercise jurisdiction over a request for a declaratory judgment. *See, e.g.,*

*Bituminous Cas. Corp. v. J & L Lumber Co.*, 373 F.3d 807, 812-13 (6th Cir. 2004)

(citing *Scottsdale Ins. Co. v. Roumph*, 211 F.3d 964, 967 (6th Cir. 2000), and

setting forth the five factors).  No party challenges this court's exercise of

jurisdiction to issue a declaratory judgment and, on balance, the factors weigh in

favor of the court's exercising jurisdiction.[3]  Therefore, it is appropriate for the court

to determine GAAC's obligations.

GAAC requests a declaratory judgment that the insurance policy it issued

affords no coverage for any claims asserted in the litigation and that it therefore

has no duty to defend or indemnify Dekalands.  GAAC issued a "Non-Trucking

Liability" insurance policy[4] to Billie Dekalands, defendant Dekalands's wife, when

she purchased the semi-tractor that Dekalands was driving at the time of the

accident.  GAAC points to two reasons that it has no duty to defend or indemnify

Dekalands: (1) because the accident at issue is specifically excluded from the

express language of the GAAC policy, and (2) because Summitt is strictly

---

[3]First, declaratory judgment settles the controversy about the extent of GAAC's coverage for Bays's injuries. *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 555-56 (6th Cir. 2008).  Second, a declaratory judgment would serve a useful purpose in clarifying the legal relationship between GAAC and Dekalands. *Id.* at 556-58.  Third, the case does not present the appearance of "a race for res judicata;" the court gives GAAC the benefit of the doubt that "no improper motive fueled the filing of this action." *Bituminous*, 373 F.3d at 814.  Fourth, a declaratory action would not increase the friction between federal and state courts or improperly encroach on state jurisdiction since there is no evidence of any concurrent or anticipated state proceedings addressing GAAC's obligations under the insurance policy at issue. *Id.* at 813-15.  Fifth, and finally, declaratory judgment is no less effective than any potential alternative remedy. *See id.* at 813.

[4]Such insurance policies, also commonly known as "bobtail insurance" policies, are frequently carried by owner-operators who lease trucks. *Prestige*, 99 F.3d at 1342 (citing 4 Sorkin*, Goods in Transit* § 45.02(2) (1994)). Generally they provide coverage "only when the tractor is being used without a trailer or with an empty trailer, and is not being operated in the business of an authorized carrier." *Id.*

vicariously liable for Dekalands's negligence, rendering Summitt and its insurance

company, not GAAC, responsible for any judgment rendered against Dekalands.

This court explained in Section II that it will not impose strict vicarious

liability on Summitt in the instant case, so GAAC's second rationale for escaping

coverage liability fails. On the other hand, GAAC is correct that this accident is not

covered by the terms of the policy, so it has no responsibility to defend or

indemnify Summitt based on its first rationale.

GAAC points to the "Exclusions" provision of its policy with Dekalands,

which states:

> This insurance does not apply to any of the following:
> Liability arising out of any accident which occurs while the covered
> auto is being used in the business of anyone to whom the covered
> auto is leased, rented, or loaned or while the covered auto is being
> used to transport cargo of any type. For purposes of this Exclusion
> the phrase "in the business of anyone to whom the covered auto is
> leased, rented or loaned," means any of the following uses of the
> covered auto:
> (a) used for the benefit of or to further the commercial interest of
> anyone to whom the covered auto is leased, rented, or loaned;
> (b) used by anyone who is acting within the scope of employment of
> anyone to whom the covered auto is leased, rented, or loaned;
> . . .
> (e) used for the purpose of traveling to or from any location where the
> covered auto is regularly garaged or any terminal or facility of anyone
> to whom the covered auto is leased, rented or loaned.

R.66, Ex. 1, Part II, ¶ C13. The interpretation of this contract language is a matter

of law for this court, *Morganfield Nat'l Bank v. Damien Elder & Sons*, 836 S.W.2d

893, 895 (Ky. 1992), which will apply Kentucky law to construe the terms of the

policy, *Erie R.R. Co. v. Tompkins,* 304 U.S. 64 (1938).

Coverage under GAAC's policy depends on whether the truck was being used "in the business of" Summitt at the time of the accident, and the policy provides specific examples of such uses. It is undisputed that Dekalands was on his way home, had dropped off Summitt's trailer at its yard, and was not under dispatch by Summitt or anyone else when the accident occurred. This court has concluded, as set out in Section II(A) above, that 49 C.F.R. § 376.12 establishes a rebuttable presumption which Summitt has not overcome that Dekalands was acting within the scope of his employment while driving the leased semi-tractor. Indeed, as a matter of Kentucky law, Dekalands was acting within the scope of his employment at the time of the accident. That is, as defined in the policy, the "covered auto" was being used in the business of Summitt, the lessee, when the accident occurred, so the situation falls within part (b) of the "Exclusions" section.

The exclusionary provision of the GAAC policy also applies because Dekalands was using the semi-trailer in the manner specifically contemplated in part (e) when he traveled from Summitt's facility to his home, the place where the truck was regularly garaged. At that time, he was also traveling from the "terminal or facility," of Summitt, to "whom the covered auto is leased, rented or loaned." Since Dekalands's activity at the time of the accident falls within at least two of the policy's specific exclusions, GAAC is not obligated to defend Dekalands, nor can GAAC be held liable for any judgment rendered against Dekalands.

V. Conclusion

Accordingly, **IT IS ORDERED** that:

(1)    Summitt Trucking LLC's motion for summary judgment (R. 49) is **DENIED**.

(2)    Donald Dekalands's motion for summary judgment (R. 64) is **DENIED**.

(3)    Donald Dekalands shall **SHOW GOOD CAUSE** within ten days of the entry of this order for his failure to serve defendant John Doe; otherwise the claims against Doe shall be dismissed pursuant to the terms of Fed. R. Civ. P. 4(m).

(4)    Great American Assurance Co.'s motion for declaratory judgment (R. 73) is **GRANTED**.  The intervenor, Great American Assurance Company, has no duty to defend or indemnify Donald Dekalands.

Signed on  February 24, 2010

**Jennifer B. Coffman, Judge**
**United States District Court**